UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF NEW YORK

MARYANN MEADORS,

                              Plaintiff,

        -against-                                          5:13-CV-0160 (LEK)

CAROLYN W. COLVIN,
Acting Commissioner of Social Security,

                              Defendant.
_____

## MEMORANDUM-DECISION and ORDER

## I.      INTRODUCTION

        This case has proceeded in accordance with General Order 18, which sets forth the

procedures to be followed in appealing a denial of Social Security benefits.  Both parties have filed

briefs.  Dkt. Nos. 14 ("Plaintiff's Brief"); 21 ("Defendant's Brief").  For the following reasons, the

judgment of the Social Security Administration ("SSA") is vacated and this case is remanded for

further proceedings consistent with this Memorandum-Decision and Order.

## II.     BACKGROUND

### A.  Plaintiff's Medical Records

        Plaintiff Maryann Meadors ("Plaintiff"), who was forty three years old at the time of the

SSA Commissioner's ("Commissioner") decision, has a history of back pain, shortness of breath,

carpal tunnel syndrome, anxiety, depression, and borderline intellectual functioning.  Dkt. No. 9

("Record") at 294.[1]  Plaintiff maintains that her medical conditions preclude her from engaging in

any gainful work activity.  R. at 24-32.  Plaintiff alleges that she injured her back at work while

_____

        [1] Citations to the Record are to the pagination assigned by the SSA.

reaching for a prescription, which led her to seek treatment from her primary care physician Dr.

Ahmed R. at 114. When Plaintiff saw Dr. Ahmed, on October 8, 2004, she complained of lower

back pain. Id. Dr. Ahmed prescribed Lioderm patches, Mobic, and an x-ray for her back pain. Id.

The x-ray showed minimal degenerative spurs of the L4 vertebral body. R. at 150.

Plaintiff saw Dr. Kuthuru, a pain management specialist, on November 17, 2004, with

complaints of back pain, and he diagnosed Plaintiff with lumbrosacral radiculopathy, spondylosis

with myelopathy, and myosfasical pain. Dr. Kuthuru recommended that Plaintiff consider

interventional spine care and prescribed Motrin, an MRI, and an at-home exercise program. R. at

125. The follow-up MRI, which Dr. Kuthuru prescribed, showed no evidence of disc herniation or

nerve root entrapment but did show slight bulging of the L3-4 and L4-5 discs as well as a central

protrusion of the L5-S1 disc. R. at 151.

Plaintiff returned to Dr. Kuthuru in December 2004 with complaints of sharp, achy, and

throbbing pain in her back, and he diagnosed her with lumbrosacral radiculopathy, lumbrosacral

spondylosis with myelopathy, and myosfasical pain, and Dr. Kuthuru prescribed the use of hot/cold

therapy, the continuance of the home exercise program, and Neurontin. R. at 128-29. Plaintiff saw

Dr. Kuthuru again in January 2005 with complaints of continued lower back pain and right lower

extremity paresthesia, and Dr. Kuthuru maintained her diagnosis. R. at 131-32. Dr. Kuthuru also

noted that prior attempts at physical therapy and chiropractic treatments had failed, yet there are no

notes in the record of these treatments other than the recommended at-home exercises prescribed on

November 17, 2004. R. at 131. Plaintiff also stated that the pain was made worse by standing and

decreased while sitting. Id. Dr. Kuthuru recommended a nerve conduction study, which was done

on February 15, 2005. R. at 137-38. The nerve conduction study showed radiculopathy affecting

the right L5-S1 neurotomal segments.  Id.

After the nerve conduction study, Dr. Kuthuru referred Plaintiff to an orthopedic spinal surgeon, Dr. Blecha.  R. at 131.  Dr. Blecha examined Plaintiff and her radiological studies, concluded that Plaintiff did not need surgery, and instead gave her two treatment options: (1) to continue the use of medications; or (2) to have a lumbar epidural steroid injection.  R. at 156-57.  Plaintiff disfavored the latter approach due to her fear of needles.  Id.

Plaintiff then went for a consultative examination on May 16, 2005, with Dr. Shayevitz.  R. at 167-69.  Plaintiff reported no medications other than Valium; she needed no assistive devices, help changing, or getting on and off the exam table; she had no difficulty rising from the chair; and appeared to be in no acute distress.  Id.  Plaintiff had no issues with her upper extremities, but the doctor found some reduced motion in her lumbar spine, tenderness in her lower back, and a right sacroiliac notch, but no spasms.  Id.  Muscle strength in her lower extremities was four out of five on a five-point strength scale, and the doctor noted that she had a decreased sensation to pinprick in her right side lower extremities.  Id.  Dr. Shayevitz opined that Plaintiff would have "limitations in any prolonged sitting, standing, walking, and certainly any heavy lifting" but did not quantify "prolonged."  Id.

On February 21, 2006, Plaintiff returned to Dr. Ahmed with complaints of back pain and a "constant ache."  R. at 239.  Dr. Ahmed prescribed Flexeril and Ultram.  Id.  Plaintiff saw Dr. Ahmed again on June 5, 2006, for lower back pain.  R. at 249.  Plaintiff stated that she had stopped physical therapy and had found no relief from chiropractic care.  Id.  Dr. Ahmed prescribed Motrin.  Id.  Plaintiff saw Dr. Ahmed again on June 25, 2007, with complaints of worsening lower back pain and difficulty sleeping.  R. at 645.  Dr. Ahmed did not prescribe any medication but noted that

3

Plaintiff was taking Darvocet.  Id.

Plaintiff had another MRI and x-ray of the lumbar spine on July 5, 2007, which a radiologist and the orthopedic surgeon, Dr. Blecha, reviewed and interpreted.  R. at 648, 655.  Dr. Blecha noted that while the radiologist found minimal central protrusion at L5-S1, he did not see it in the films.  R. at 655.  Dr. Blecha then noted that Plaintiff might have minimal protrusion of disc material at L5-S1 on the left side, which is not the side she was experiencing pain.  Id.  He also noted that "there is no loss of signal consistent with degenerative disc disease" and then went on to state that he "did not know why this lady has so much low back pain" since the etiology of the pain was unknown.  R. at 655.  He then stated that he had referred her for pain management to Dr. Kuthuru years ago, and Plaintiff stated she did not see him due to insurance issues.  Id.  That same month, Dr. Kuthuru opined that Plaintiff could only lift and/or carry ten pounds occasionally, could sit less than six hours per day in an eight-hour workday, and could stand less than two hours per day.  R. at 653-54.[2]

Plaintiff underwent another consultative examination with Dr. Ganesh on August 20, 2007.  Dr. Ganesh noted that Plaintiff did not appear to be in any acute distress, she walked on her heels and toes without issue, had no assistive devices, needed no assistance changing or getting on and off the exam table, and had no issues rising from the chair.  R. at 657.  Dr. Ganesh noted Plaintiff had a lumbar flexion of sixty degrees, extension of ten degrees, and that her lateral flexion was full.  Id.  Plaintiff had a negative straight leg raise test, equal deep tendon reflexes, five out of five on a five-point strength scale in lower and upper extremities, but had a limited squat.  R. at 657-58.  Dr. Ganesh opined that Plaintiff had "no limitation for sitting, standing, or walking . . . mild to moderate

---

[2] The State of New York has since suspended Dr. Kuthuru's medical license due to irregularities in his practice.  R. at 301.

limitation for lifting, carrying, pushing, and pulling" but did not quantify "mild to moderate." Id.

Dr. Ahmed then referred Plaintiff to Dr. Robinson, and orthopedic surgeon. R. at 703. Plaintiff saw Dr. Robinson on September 11, 2009, with complaints of dysfunction and pain in her lumbar spine and numbness in her lower extremities that had become progressively more severe. Id. Plaintiff claimed sitting, standing, and walking aggravated the issue and the pain caused her difficulty with sleep. Id. Dr. Robinson requested an updated lumbar MRI before prescribing any treatment. R. at 705. On September 28, 2009, the MRI study showed mild to moderate disc degeneration of L3-L4, no narrowing of spinal canal, and minimal bulging of the L4-L5. R. at 706. The radiologist diagnosed Plaintiff with moderate disc degenerative disease. R. at 700-07. Dr. Robinson, after reading the MRI and giving Plaintiff a physical examination on October 9, 2009, dictated that Plaintiff had bilateral tenderness to her lumbosacral spine, a ninety degrees straight leg raise test, normal lower extremity motor exam on both sides, and a limited range of motion in right and left side bends. R. at 703-05. However, Dr. Robinson had noted on September 11, 2009, that Plaintiff had decreased sensation in her right and left lower extremities. R. at 700-02. He prescribed her an epidural injection, which Plaintiff later refused due to her fear of needles. Id. It was then later noted in Dr. Ahmed's notes on September 17, 2009, that Dr. Robinson also prescribed Plaintiff hydrocodone (Lortabs). R. at 714.

In May 2010, Dr. Robinson referred Plaintiff to the New York Spine and Wellness Center where, over the course of an eleven month period, three different doctors saw her. On May 11, 2010, Plaintiff saw Dr. Cantania, and reported having radiating lower back pain that caused her to

wake up during the night and only get four to five hours of sleep per night.[3]  R. at 736-38.

Examination showed tenderness to Plaintiff's sacroiliac joint, an antalgic gait, full range of motion

in lower extremities, limited motion in her spine, and normal (2+) reflexes on both sides.  R. at 743.

Dr. Cantania recommended that she continue to use the Lortabs (hydrocodone) and scheduled her

for a nerve block, which Plaintiff later cancelled due to her phobia of needles.  R. at 737, 741, 743.

On June 4, 2010, Plaintiff saw Dr. Tallarico, who recommended chiropractic visits.  R. at 741.

There is no evidence in the record that Plaintiff went to any chiropractic visits.

On August 17, 2010, Plaintiff had her first visit with pain management specialist, Dr. Tiso.

R. at 738-39.  Dr. Tiso's physical examination of Plaintiff revealed paraspinous tenderness on the

right side, tenderness to Plaintiff's SI joint and sciatic notch, and a normal range of motion.  Id.  He

diagnosed Plaintiff with lumbar degenerative disc disease and lumbar radiculopathy, and

recommended she continue her current medications with the addition of Ambien.  Id.  Dr. Tiso saw

Plaintiff for her next follow-up visit on October 19, 2010; diagnosis and physical examination were

the same, and he recommended she continue the same treatment plan with no changes.  Id. at 736-

37.  Dr. Tiso opined that Plaintiff would be unable to sit or stand for more than fifteen minutes and

could not lift or carry anything above ten pounds.  Id.  Plaintiff followed up again with Dr. Tiso on

April 5, 2011, with the same complaint of lower back pain and Dr. Tiso noted the same diagnosis

and gave Plaintiff the same treatment plan as prescribed beforehand.  Id. at 733-34.

On October 25, 2010, Dennis Noia, Ph. D., performed an intelligence evaluation of Plaintiff

and assessed Plaintiff as having an IQ of 77, indicative of borderline intellectual functioning.  R. at

---

[3] In her brief, Plaintiff asserts that she was treated by Dr. Tiso at the Spine and Wellness Center; however, the signing physician is Dr. Cantania.  Pl.'s Br. at 10; Dkt. No. 9 at 744.

721-26. Dr. Noia also opined that Plaintiff had mild limitations in making complex judgments but had no limitations in her ability to understand, remember, or carry out complex instructions, and had no issue remembering simple instructions. Id.

## B. ALJ Hearing

On February 2, 2005, Plaintiff protectively filed for disability insurance benefits and supplemental security income, alleging disability resulting from back pain that had caused her difficulty standing and sleeping from an onset date of November 16, 2004. R. at 52, 68. An Administrative Law Judge ("ALJ") denied Plaintiff's first claim on September 28, 2006. R. at 24-32. Plaintiff then filed a civil action in the United States District Court for the Northern District of New York and the Court affirmed the ruling on June 16, 2009. R. at 363; Meadors v. Astrue, No. 07-CV-0623, 2009 WL 1706580, at *1 (N.D.N.Y. June 16, 2009) (Kahn, J.). The United States Court of Appeals for the Second Circuit then affirmed in part, reversed in part, and remanded the case for further administrative proceedings. Meadors v. Astrue, 370 F. App'x 179 (2d Cir. 2010). The Appeals Council vacated the decision, sent it back to an ALJ for further proceedings consistent with the order of the Council, and ordered that Plaintiff be offered the opportunity for another hearing. Meadors v. Astrue, No. 07-CV-0623, 2010 WL 1945763, at *1 (N.D.N.Y. May 13, 2010) (Kahn, J.). Plaintiff took said opportunity.

The second hearing occurred on June 22, 2011. During the hearing, vocational expert ("VE") Donald Shader testified about Plaintiff's previous work experience and answered multiple hypotheticals posed by both the ALJ and Plaintiff's attorney. R. at 809. Mr. Shader reported that prior to the hearing, Plaintiff worked as a pharmacy technician and that any other jobs she worked were all placements through a temporary service, and thus were irrelevant to his assessment. R. at

810-11.  The ALJ then posed a hypothetical to the VE as to what vocations were available to

someone of Plaintiff's age, education, and experience and with the following limitations:

> could lift and carry 20 pounds occasionally and 10 pounds frequently; can stand and
> walk six out of eight hours, and sit six out of an eight-hour period; push and pull
> consistent with light exertion.  There are no postural, manipulation - or manipulative,
> visual, or environmental limitations except only occasional squatting and no climbing
> of ladders and scaffolds.  And mentally . . . can understand and follow simple
> instructions and directions and perform simple and some complex tasks with
> supervision and independently, and can maintain attention and concentration for
> tasks, can attend to a routine and maintain a schedule, can learn new tasks, [and] can
> work in a low-stress environment, defined as occasional decisions making and
> occasional interaction with others.

R. at 816-18.  Considering all those factors, the VE testified that an individual in the above

hypothetical would be able to perform such occupations as a mail clerk, an assembler of small parts,

and an office helper.  Id.

The ALJ then changed the physical limitations of the hypothetical to a person who was

limited to only standing and walking four hours out of an eight-hour period, thirty minutes at a time

and sitting six hours out of an eight hour period, forty five minutes at a time, and with the same

mental limitations.  R. at 820-21.  The VE again said that person could be a mail clerk or an office

helper, but a small parts assembler may not be feasible.  Id.  The hypothetical proposed by the ALJ

to the VE was the same except that the hypothetical person would be limited to lifting and carrying

only ten pounds, standing and walking four hours out of an eight hour period thirty minutes at a

time, and sitting six hours out of an eight-hour period thirty minutes at a time.  R. at 821-22.  The

VE testified that a person in that hypothetical could be an eyeglass frame polisher.  R. at 823.  The

VE then testified that while there are more jobs out there for a person matching the above

hypothetical, none existed in sufficient numbers.  R. at 824.

8

Plaintiff's attorney then modified the hypothetical, adding limitations of needing

unscheduled breaks that were beyond the breaks one normally gets and if said person had to take

about four days or more off a month. R. at 825-26. The VE answered that there would be no jobs

available to someone in that situation. R. at 826.

### C. The ALJ's Decision

ALJ Robert E. Gale issued a decision denying Plaintiff's application for disability and

supplemental security income. R. at 291-307. The ALJ found that Plaintiff had not engaged in any

substantial gainful activity since November 16, 2004. R. at 294. The ALJ then found that Plaintiff

did suffer from a severe impairment, lumbar spine degenerative disc disease. R. at 294. The ALJ

did not find that Plaintiff had any other combination of impairments that would meet the medical

standard of another severe impairment as listed in the law. R. at 298. The ALJ further found that

Plaintiff had the residual functional capacity ("RFC") to:

> lift and/or carry 20 pounds occasionally and 10 pounds frequently, stand and/or walk
> for six hours in an eight-hour day, sit for six hours in an eight-hour day, and push
> and/or pull consistent with light exertion. She has no postural, manipulative, visual,
> or environmental limitations except she can only occasionally squat and should not
> climb ladders and scaffolds. [Plaintiff] can understand and follow simple
> instructions and directions, perform simple and some complex tasks with supervision
> and independently, maintain attention and concentration for tasks, attend to a routine,
> maintain a schedule, learn new tasks, and work in a low[-]stress environment,
> defined as occasional decision-making and occasional interaction with others.

R. at 299. Furthermore, while it was determined that Plaintiff could not perform her past relevant

work, the VE identified jobs that exist in significant numbers in her geographic area and in the

national economy, which Plaintiff could perform. R. at 305-06. Therefore, the ALJ concluded that

Plaintiff was not disabled by the standards set forth in the Social Security Act. R. at 307.

Plaintiff filed a request for review on November 29, 2011. R. at 283. On October 23, 2012,

the ALJ's decision became the final decision of the Commissioner when the Appeals Council denied the request for review. R. at 279-81. Plaintiff timely filed an appeal on February 11, 2013. Dkt. No. 1 ("Complaint").

## III.    LEGAL STANDARD

### A.  Standard of Review

When the Court reviews the SSA's final decision, it determines whether the ALJ applied the correct legal standards and if his decision is supported by substantial evidence in the record. 42 U.S.C. § 405(g); Roat v. Barnhart, 717 F. Supp. 2d 241, 248 (N.D.N.Y. 2010) (Kahn, J.) (citing Berry v. Schweiker, 675 F.2d 464, 467 (2d Cir. 1982)). Substantial evidence amounts to "more than a mere scintilla," and it must reasonably support the decision maker's conclusion. Halloran v. Barnhart, 362 F.3d 28, 31 (2d Cir. 2004) (quoting Richardson v. Perales, 402 U.S. 389, 401 (1971)). The Court defers to the Commissioner's decision if it is supported by substantial evidence, "'even if it might justifiably have reached a different result upon a *de novo* review.'" Sixberry v. Colvin, No. 12-CV-1231, 2013 WL 5310209, at *3 (N.D.N.Y. Sept. 20, 2013) (quoting Valente v. Sec'y of Health and Human Servs., 733 F.2d 1037, 1041 (2d Cir. 1984)). However, the Court should not uphold the ALJ's decision when there is substantial evidence, but it is not clear that the ALJ applied the correct legal standards. Johnson v. Bowen, 817 F.2d 983, 986 (2d Cir. 1987).

### B.  Standard for Benefits

According to SSA regulations, disability is "the inability to do any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 20 C.F.R. § 404.1505(a). An individual seeking disability benefits

"'need not be completely helpless or unable to function.'" De Leon v. Sec'y of Health and Human Servs., 734 F.2d 930, 935 (2d Cir. 1984) (quoting Gold v. Sec'y of Health, Educ. and Welfare, 463 F.2d 38, 41 n.6 (2d Cir. 1972)).

In order to receive disability benefits, a claimant must satisfy the requirements set forth in the SSA's five-step sequential evaluation process. 20 C.F.R. § 404.1520(a)(1). In the first four steps, the claimant bears the burden of proof; at step five, the burden shifts to the SSA. Kohler v. Astrue, 546 F.3d 260, 265 (2d Cir. 2008) (quoting Perez v. Chater, 77 F.3d 41, 46 (2d Cir. 1996)). If the SSA is able to determine that Plaintiff is disabled or not disabled at any step, the evaluation ends. 20 C.F.R. § 404.1520(a)(4). Otherwise, the SSA will proceed to the next step. Id.

At step one, the SSA considers plaintiff's current work activity to see if it amounts to "substantial gainful activity." 20 C.F.R. § 404.1520(a)(4)(i). If it does, plaintiff is not disabled under SSA standards. Id. At step two, the SSA considers whether plaintiff has a severe medically determinable physical or mental impairment, or combination of impairments that is severe, that meets the duration requirement in § 404.1509. Id. at § 404.1520(a)(4)(ii). If she does not have such impairment, plaintiff is not disabled under SSA standards. Id. At step three, the SSA considers the severity of plaintiff's medically determinable physical or mental impairment(s) to see if it meets or equals an impairment and the requisite duration listed in 20 C.F.R. § 404(P), Appendix I. Id. at § 404.1520(a)(4)(iii). If it does not, the SSA moves on to step four to review plaintiff's RFC and past relevant work. Id. at § 404.1520(a)(4)(iv). Plaintiff is not disabled under SSA standards if the RFC reveals that plaintiff can perform past relevant work. Id. If plaintiff cannot perform her past relevant work, the SSA decides at step five whether adjustments can be made to allow plaintiff to work somewhere in a different capacity. Id. at § 404.1520(a)(4)(v). If appropriate work does not

11

exist, then the SSA considers plaintiff to be disabled.  Id.

## IV.    DISCUSSION

Plaintiff argues that: (1) the ALJ's RFC determination is unsupported by substantial

evidence, as the ALJ erred by according inadequate weight to the opinion of treating physician Dr.

Tiso, failed to properly analyze the opinion of consultative examiner Dr. Shayevitz, and erroneously

accorded significant weight to the opinion of consultative examiner Dr. Ganesh; (2) the ALJ erred in

failing to make a proper credibility finding as to Plaintiff's testimony; and (3) the ALJ erred by

relying on an incomplete hypothetical in determining that Plaintiff could perform jobs in the

national economy.  Pl.'s Br. at 1.

### A.  The Treating Physician Rule and Weight of Evidence

Plaintiff asserts that the ALJ violated the treating physician rule by not giving substantial

weight to Dr. Tiso, Plaintiff's treating physician.  Pl.'s Br. at 14.  Although the ALJ must determine

whether or not a plaintiff is disabled, the ALJ is not a physician, and thus must consider the treating

physician's opinions in his or her decision.  Snell v. Apfel, 177 F.3d 128, 133 (2d Cir. 1999).  Yet,

the opinion of a treating physician need not be "afforded controlling weight where . . . the treating

physician issued opinions that are not consistent with other substantial evidence in the record."

Halloran, 362 F.3d at 32.  If the Court finds the ALJ erred in failing to adequately explain his

reasoning for not crediting the opinion of any of the treating physicians, then the case must be

remanded.  Id.

The ALJ has the duty to assess all the medical opinions in the record when deciding a

plaintiff's claim.  20 C.F.R. § 404.1527(c)(2).  Since there is more than one medical opinion in this

case, the ALJ looks specifically to the treating physician's opinion.  Id.  The ALJ then must give the

treating physician's opinion controlling weight if it "is well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in [Plaintiff's] record." Id. The ALJ must provide "good reason" for not granting controlling weight to the treating physician, examining the following factors:

> (i) the frequency of examination and the length, nature and extent of the treatment relationship; (ii) the evidence in support of the treating physician's opinion; (iii) the consistency of the opinion with the record as a whole; (iv) whether the opinion is from a specialist; and (v) other factors brought to the Social Security Administration's attention that tend to support or contradict the opinion.

Halloran, 362 F.3d at 32. The Second Circuit stated that it will "not hesitate to remand" if the ALJ does not include these explanations. Id. at 33; see also Ryan v. Astrue, 650 F. Supp. 2d 207, 212 (N.D.N.Y. 2009) (Kahn, J.).

Furthermore, if an "[o]pinion of claimant's treating physician, that claimant was totally disabled, was not supported by objective evidence" then the ALJ is not required to give the treating physician's opinion controlling weight when making a disability determination. Thompson v. Barnhart, 75 F. App'x 842, 845 (2d Cir. 2003). For the purposes of a SSI disability hearing, objective evidence means medical signs, which include observable abnormalities and lab findings such as x-rays. 20 C.F.R. § 404.1528(b) and (c). "Other" evidence is all evidence described in §§ 404.1512(b)(2) through (8) and 404.1513(b)(1), (4), (5), and (d), which includes Plaintiff's medical history, physician's statements, medical opinions, and so forth. However, if the objective evidence supports Plaintiff's disability and that evidence is "not inconsistent with the other substantial evidence in [the] record," that treating physician's opinion deserves controlling weight. 20 C.F.R. § 404.1527(d)(2); see Halloran, 362 F.3d at 3132.

*1. Dr. Tiso*

Plaintiff argues that the ALJ erred by according inadequate weight to the opinion of treating physician Dr. Tiso. Pl.'s Br. at 1. The ALJ accorded Dr. Tiso's opinion "limited weight," finding that Dr. Tiso had documented positive findings; objective evidence in the record did not support his opinion; and his opinion was "inconsistent with [Plaintiff's] treatment history and activities of daily living." R. at 303. However, the ALJ failed to recognize Dr. Tiso as a treating physician and to properly assess Dr. Tiso's opinion, since the ALJ failed to "comprehensively set forth [his] reasons for the weight assigned to a treating physician's opinion." Halloran, 362 F.3d at 33.

First, the ALJ failed to take into consideration that Dr. Tiso was a pain management specialist and had seen the patient three times in less than a year. R. at 302-03. The ALJ thus failed to consider some of the various factors that he should consider in deciding what weight to give the opinion of a treating physician. See Halloran, 362 F.3d at 32. The ALJ also did not take into consideration Dr. Tiso's diagnosis of lumbar degenerative disc disease or Dr. Tiso's RFC determination, which were not inconsistent with other evidence in the record, including the statements of Dr. Ahmeds and Dr. Shayevits, who both opined the Plaintiff had limited functionality. Furthermore, the ALJ failed to take into consideration the objective medical evidence of an MRI done in 2009, which showed Plaintiff as having moderate degenerative disc disease and is consistent with the record. R. at 706-07. Therefore, the ALJ failed to give Plaintiff's treating physician controlling weight and failed to properly elaborate on why he declined to give him controlling weight. This failure is grounds for remand. Dunker v. Astrue, No. 11-CV-321A, 2014 WL 297100, at *9-10 (W.D.N.Y. Jan. 27, 2014).

14

### 2. Dr. Shayevitz

Plaintiff next argues that the ALJ erred in failing to contact the consultative physician Dr. Shayevitz to request clarification on the term "prolonged" in concern to Plaintiff's functional limitations. Pl.'s Br. at 16-17. The ALJ only has the duty to contact a physician if there are "clear gaps" in the medical record; however, he or she is not required to contact the physician if the ALJ can decide whether plaintiff is disabled based on the existing evidence. DeChirico v. Callahan, 134 F.3d 1117, 1184 (2d Cir. 1998); see also 20 C.F.R. § 404.1512(e). Furthermore, there is no requirement that an ALJ contact consultative examiners because the regulations only address contacting plaintiff's treating physician. Id. Since this argument concerns the ALJ contacting a consultative physician, who only saw Plaintiff once, the ALJ did not have the duty to contact that physician. Even if the rule applied to any and all physicians, the ALJ was able to decide whether Plaintiff was disabled as per the existing evidence in the record. Finally, Plaintiff's claim that the ALJ failed to state the weight that he accorded Dr. Shayevitz's opinion is without merit. The ALJ stated that Dr. Shayevitz's opinion was of limited utility. R. at 300. Therefore, since the ALJ properly stated the weight accorded Dr. Shayevitz's opinion, Plaintiff's contention is not at issue.

### 3. Dr. Ganesh

Next, Plaintiff contends that the ALJ erred in assigning significant weight to the findings of consultative physician Dr. Ganesh. Pl.'s Br. at 18. However, in a social security disability benefits case, the ALJ may treat a consultative physician's opinion as substantial evidence so long as the physician's "assessment was consistent with the objective medical evidence." Barringer v. Comm'r of Soc. Sec., 358 F. Supp. 2d 67, 79 (N.D.N.Y. 2005). Dr. Ganesh based his opinion on Plaintiff's subjective allegations of pain and mobility limitations, a physical examination of mobility, a

neurological examination, list of medications, and medical imaging. R. at 657-58. The ALJ found

Dr. Ganesh's opinion to be consistent with the objective medical evidence in the record. R. at 301.

The medical imaging studies showed mild to moderate disc degenerative disease with no herniation.

R. at 151, 648. The ALJ found this to be consistent with Dr. Ganesh's physical exam of Plaintiff

where he noted that Plaintiff needed no assistance during the exam and found a full cervical range of

motion, and only slight limitation in her lumbar's range of motion. R. at 302.

Finally, Plaintiff claims the use of the terms "mild" and "moderate" was too vague and did

not permit the ALJ to make the necessary inferences with respect to Plaintiff's RFC. Pl.'s Br. at 18.

Plaintiff is correct. Plaintiff relies on Curry v. Apfel, which held that the use of the terms "mild"

and "moderate," without additional information, is too vague, and that the ALJ cannot rely upon

those terms when determining Plaintiff's ability to work. 209 F.3d 117, 123 (2d Cir. 2000). The

following findings were listed in Dr. Ganesh's examination report: no visible distress, needed no

assistance, full cervical range of motion; some limited lumbar range of motion, and strength was

five out of five on a five-point strength scale in her upper and lower extremities, which could

constitute the basis for Dr. Ganesh's opinion. R. at 656-58. However, Dr. Ganesh used broad terms

such as "mild" and "moderate" when describing Plaintiff's condition, which are too vague for an

ALJ to rely on. Graves v. Astrue, No. 12-CV-48, 2013 WL 4779193, at *12 (N.D.N.Y. Sept. 5,

2013). With such vague findings, the ALJ is precluded from according more weight to Dr. Ganesh

than to Plaintiff's treating physician. Id.

## B. Credibility Determination

Plaintiff claims that the ALJ's credibility determination is unsupported by substantial

evidence. Pl.'s Br. at 19. Under C.F.R. § 404.1529, the ALJ must evaluate a claimant's credibility

as part of her disability determination.  When the ALJ weighs a plaintiff's credibility to determine

her RFC, the court is required to review it.  <u>Fallon v. Colvin</u>, No. 11-CV-1339, 2014 WL 61244, at

*5 (N.D.N.Y. 2014) (Kahn, J).  When considering credibility "[a]n [ALJ] may properly reject

[subjective complaints] after weighing the objective medical evidence in the record, the claimant's

demeanor, and other indicia of credibility, but must set forth his or her reasons 'with sufficient

specificity to enable [the Court] to decide whether the determination is supported by substantial

evidence.'"  <u>Lewis v. Apfel</u>, 62 F. Supp. 2d 648, 651 (N.D.N.Y. 1999) (quoting <u>Gallardo v. Apfel</u>,

No. 96 CIV 9435, 1999 WL 185253, at *5 (S.D.N.Y. Mar. 25, 1999)).  Furthermore, "whatever

findings the ALJ makes must be consistent with the medical and other evidence."  <u>Williams ex rel.

Williams v. Bowen</u>, 859 F.2d 255, 261 (2d Cir. 1988).  If, however, the record supports contrary

findings, the Court will give the ALJ's factual findings conclusive weight so long as they are

supported by substantial evidence.  <u>Genier v. Astrue</u>, 606 F.3d 46, 49 (2d Cir. 2010).

      SSR 96-7p includes a two-part inquiry for evaluating a plaintiff's contentions of pain and

their symptoms:

> First, the adjudicator must consider whether there is an underlying medically
> determinable physical or medical impairment(s) . . . that could reasonably be
> expected to produce the individual's pain or other symptoms . . . .
>
> Second . . . the adjudicator must evaluate the intensity, persistence, and limiting
> effects of the individual's symptoms to determine the extent to which the symptoms
> limit the individual's ability to do basic work activities . . . .

According to 20 C.F.R. §§ 404.1529(c)(3)(i)-(vii) and 416.929(c)(3)(i)-(vii), if a plaintiff's

allegations of pain and symptoms are not supported by objective weight, then the ALJ must consider

the following factors in considering the plaintiff's credibility:

> (i) [Plaintiff's] daily activities;

(ii) The location, duration, frequency, and intensity of pain or other symptoms;
(iii) Precipitating and aggravating factors;
(iv) The type, dosage, effectiveness, and side effects of any medication taken to alleviate pain or other symptoms;
(v) Treatment, other than medication, received for relief of pain or other symptoms;
(iv) Any measures used to relieve pain or other symptoms; and
(vii) Other factors concerning functional limitations and restrictions due to pain or other symptoms.

Ritter v. Astrue, No. 09-CV-1167, 2012 WL 1717302, at *11 (N.D.N.Y. May 15, 2012).

Here, the ALJ included both components of the two-part test in his decision. The ALJ found "the claimant's medically determinable impairments could reasonably be expected to cause the alleged symptoms." R. at 304. Next, he found that Plaintiff's "statements concerning the intensity, persistence and limiting effects of those symptoms were not entirely credible." Id. The ALJ based his credibility determination on the following factors: (1) Plaintiff's testimony regarding her daily activities did not support Plaintiff's disability claim; (2) Plaintiff received limited medical treatment; and (3) Plaintiff's allegations were inconsistent "with her negative clinical findings, treatment history, and activities." R. at 72 and 304.

The ALJ notes that Plaintiff's testimony regarding her daily activities was inconsistent with clinical findings and her own admitted degree of participation in her daily activities. R. at 302-03. The ALJ found through Plaintiff's testimony that she could meet her personal care needs; could prepare small meals; do some household chores including dishes; drive herself; and go shopping with the assistance of someone, which the ALJ found to be inconsistent with her complaints of difficulty lifting, carrying, standing, sitting, climbing stairs, kneeling, squatting, reaching, or bending. R. at 299. While it is true that a plaintiff need not be invalid to be considered disabled, a plaintiff's daily activities still factor into the analysis of the plaintiff's RFC. 20 C.F.R. §

18

1529(c)(3)(i).

In the ALJ's credibility determination, he focused on Plaintiff's limited medical treatment. R. at 304. The ALJ "must not draw any inferences about an individual's symptoms and their functional effects from a failure to seek or pursue regular medical treatment without first considering any explanations that the individual may have provided . . . that may explain infrequent or irregular medical visits or failure to seek medical treatment." S.S.R. 96-7p, 1996 WL 374186, at *7. The ALJ relied upon Plaintiff's rejection of injections and interventional spinal care yet failed to consider Plaintiff's fear of needles. R. at 304. The ALJ further discredited Plaintiff's credibility by noting that Plaintiff at times took only ibuprofen. R. at 304. However, the ALJ failed to take into account the prescription pain reliever, Lortab, that Plaintiff had been taking since 2009. R. at 702, 714. The ALJ also failed to acknowledge the ineffectiveness of the prescription pain reliever.

The ALJ also considered that while Plaintiff testified she had physical therapy and chiropractic care, the record contains no evidence of such treatment, other than her word and numerous doctor referrals. R. at 372. Plaintiff did not raise the issue in her brief that the Court should consider the lack of evidence of these visits as a gap in the record. However, the ALJ raised the issue that there is no evidence of Plaintiff following through with either physical therapy or chiropractic treatment when weighing the credibility of Plaintiff's complaints. R. at 304. This lack of proof is an obvious gap in the record. When "there are gaps in the administrative record or the ALJ has applied an improper legal standard," the case should be remanded for further development of evidence. Parker v. Harris, 626 F.2d 225, at 325 (2d Cir. 1980).

The ALJ found that while Plaintiff was partially credible, insofar as her condition could reasonably cause her pain, he did not find that the objective medical evidence supported Plaintiff's

19

allegation of the severity, persistence, and significant physical functional limitations. R. at 304.

The ALJ stated that MRI findings did not support Plaintiff's allegations. Id. However, the ALJ

failed to address the most recent MRI findings in 2009, which found mild to moderate disc

degeneration of L3-4, no narrowing of spinal canal, and minimal bulging of the L4-5. R. at 706.

The ALJ's "failure to acknowledge relevant evidence or to explain its implicit rejection is plain

error." St. Louis ex rel. D.H. v. Comm'r of Soc. Sec., No. 11-CV-847, 2014 WL 2894438, at *4

(N.D.N.Y. June 25, 2014) (quoting Pagan v. Chater, 923 F.Supp. 547, 556 (S.D.N.Y. 1996)). The

ALJ also relied upon negative clinical findings but failed to consider any contrary findings in

determining whether Plaintiff's complaints were consistent with objective medical evidence. R. at

304.

     While the ALJ complied with the standards set forth in SSR 96-7p, the ALJ incorrectly

considered the factors listed in SSR 96-7p, and therefore his determination was not based upon

substantial evidence. The ALJ also failed to be "sufficiently specific to make clear to the individual

and to any subsequent reviewers the weight the adjudicator gave to the individual's statements and

the reasons for that weight." S.S.R. 96-7P, 1996 WL 374186, at *4. Furthermore, the ALJ, by

failing to fill the gaps in the administrative record, could not have properly evaluated Plaintiff's

credibility. Therefore, "remand is necessary so that the ALJ may properly assess Plaintiff's

credibility in accordance with the regulations and after reexamination of the relevant evidence in the

record," since the ALJ's credibility determination was not supported by substantial evidence. Shutts

v. Colvin, No. 12-CV-0734, 2013 WL 4080601, at *10 (N.D.N.Y. Aug. 13, 2013).

    **C. VE Testimony**

     Plaintiff argues that the ALJ erred in relying on an incomplete hypothetical posed to the VE.

Pl.'s Br. at 20. Plaintiff argues that since the restrictions proposed to the VE failed to consider Dr. Tiso's opinions, the RFC was based on inadequate evidence. Id. However, because the ALJ erred in the weight it assigned Dr. Tiso's opinion, the Court cannot properly consider whether the ALJ's hypothetical failed to reflect the opinions of Plaintiff's physicians.

## V. CONCLUSION

Accordingly, it is hereby:

**ORDERED**, that the decision of the Commissioner is **VACATED**, and the case is **REMANDED** for a new hearing consistent with this Memorandum-Decision and Order; and it is further

**ORDERED**, that the Clerk of the Court serve a copy of this Memorandum-Decision and Order on all parties.

**IT IS SO ORDERED**.

DATED:      January 15, 2015
               Albany, New York

Lawrence E. Kahn
U.S. District Judge